**Federal Defenders OF NEW YORK, INC.**

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director
and Attorney-in-Chief*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

March 10, 2023

**BY ECF and EMAIL**

Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

RE:   **United States v. Filippo Bernardini, 21 CR 458 (CM)**

Dear Judge McMahon:

Why did he do it? Why would someone go to such lengths to obtain so many unpublished manuscripts and then do *nothing* with them? Not sell them. Not share them. Not seek to enrich himself financially in any way with them. Even Your Honor, at the initial conference in this case, was curious: "What did he do with these manuscripts that he obtained?" ECF No.13 at 2-3. At that time, the Government was still investigating to make sure that no manuscripts had been offered for sale. The investigation is now complete. The Court's initial instinct was largely correct: "He wanted to read books before they were published." *Id* at 3.

Mr. Bernardini explains his offense conduct in greater detail in his lengthy letter to the Court, but in part, he "wanted to enjoy the books in [his] own space, with [his] own reading pace, without [his] thoughts being influenced by what other people. . . think about them." *See* Exhibit A, Letter of Filippo Bernardini at 2. Humans are complex beings and rarely is there just one motivation. After being unable to find work in the publishing industry, Mr. Bernardini felt rejected and excluded. He "had a burning desire to feel like he was still one of these publishing professionals and read these new books." *Id*. And there was, as discussed more fully below, a compulsive aspect to his conduct. As explained by Dr. Mary Cohen, his offense can be understood as a form of "extreme collecting" often seen in people with ▇▇▇. *See* Exhibit B at 9, Report of Dr. Mary Cohen.

1

Mr. Bernardini is a thirty-year-old Italian citizen who has had no prior contact with the criminal justice system in any country. For the past fourteen months he has been under strict pretrial supervision, with an ankle bracelet monitoring his location, via GPS, at all times. He had initially been required to advise his pretrial officer if he left the house for longer than a single hour and is still subject to a daily curfew. He may not travel to the Bronx or Queens without permission. He has been required to live alone in a country where he has no family and only one friend. He has been prohibited from working because of his limited immigration status in this country. His life and offense have been the subject of international media attention. He has a felony conviction which will have collateral immigration consequences. He has lived with the daily anxiety of what his sentence will be for more than a year. He is deeply remorseful and ashamed of his criminal conduct and has taken steps to ensure that nothing similar will ever happen again.

Mr. Bernardini has been punished sufficiently. For the reasons set forth more fully below, I ask the Court to impose a sentence of time-served with an order of restitution in the amount of $88,000. Such a sentence would allow Mr. Bernardini to return immediately to the United Kingdom, find gainful employment, and resume working so that he may promptly pay full restitution.

**Background**

Filippo Bernardini was born in 1992 and raised in Amelia, Italy, a small, conservative town in the Umbrian region of Central Italy.[1] PSR, ¶51. His parents, Piero Bernardini and Mara Pantaleoni, divorced when he was 8 years old, and he was raised by his mother. *Id*. Mr. Bernardini recalls a lonely childhood, during which his parents expressed little interest in his emotional needs. PSR, ¶57. He was bullied in school, labeled as strange and called names. PSR, ¶56. By the time he started college, Mr. Bernardini knew he was gay. His peers at school made fun of him and his deeply conservative parents largely rejected his sexual orientation. PSR ¶56-57.

Mr. Bernardini found comfort in books and stories at an early age. PSR, ¶60. In his letter to the Court he writes, "I have always loved books. I grew up in a small Italian town and . . . reading a book has always been like meeting new people and getting into worlds and cultures which I could not reach otherwise." Exhibit A at 1. As a socially awkward child, he started reading to create his "own world, have [his] own space and even make new friends." *Id*.

---

[1] All references to the presentence report are to the draft report dated February 22, 2023.  The defense has not yet received the final version of the PSR.

Mr. Bernardini also started writing at a young age. As a teenager, he journaled about his life and being bullied in high school. He eventually converted the journals into a novel, called *Bulli*, a transparently autobiographical story of a lonely and frustrated high school student named "Diego" who was bullied at school and rejected by his parents for being gay. PSR, ¶58. In *Bulli*, Diego is confronted with an ethical conundrum when he witnesses a horrible car accident involving one of the students who taunt him at school. Diego must decide whether to help him. Diego does, of course, by calling an ambulance and going with him to the hospital to make sure he is okay. In writing *Bulli*, the teenaged Mr. Bernardini sought a safe space to navigate feelings of loneliness and rejection while affirming what he understood to be right and wrong.

*Bulli* also represented Mr. Bernardini's first interaction with the publishing industry. In 2008, an Italian publisher agreed to edit and publish the book as young adult fiction. Mr. Bernardini's mother negotiated for the book to be published under a pseudonym to protect her son's privacy. But his father, who shares the name "Bernardini" and aspired to a political career, outed his son to their conservative community, prioritizing his own career and reputation over his son's need for privacy. PSR, ¶58.

Mr. Bernardini escaped the loneliness of small-town life by moving to Milan for college. PSR, ¶90. He embraced his love of language by majoring in Mandarin Chinese and English. A "language savant," Mr. Bernardini is fluent in five languages and can read several others, including Norwegian, Dutch, Mandarin and Korean. PSR, ¶94, Ex. B at 9.

After college, Mr. Bernardini moved to London to pursue a master's degree in Publishing at University College London. PSR, ¶91. While in graduate school, he completed a short internship at the London publishing house Granta, where he screened and summarized manuscripts. The following summer, he worked as an intern at Andrew Nurnberg Associates, a literary agency specializing in selling translation rights. PSR ¶102.

At Andrew Nurnberg, Mr. Bernardini struggled to navigate social interactions: "I really enjoyed my time there so much that I probably believed the people working there liked me as much as I liked them. Ironically, while I could easily interpret meaning and nuances in the written form, despite a linguistics degree I struggle to interpret people's tone orally, often misunderstanding people's intent and requests. This had a negative effect on my relationship with some of the agents." Ex. A. at 1; Ex. B at 4. After the internship, Mr. Bernardini applied for a full-time position at Andrew Nurnberg but was rejected. He felt confused by this entire experience. Ex. B at 4.

Mr. Bernardini continued seeking jobs in publishing in London, mostly applying for positions involving the foreign-language rights for books. He was called back for several job interviews, but never got the job. Eventually, he accepted a job as a freelance translator, translating the memoir *Our Story,* by Chinese author Rao Pingru, from Mandarin into Italian. In 2018, after two years seeking work in the publishing industry, he finally got a short-term position at Hay House UK (to cover another employee's parental leave) followed by a short-term position at Bloomsbury. In October 2019, he was offered a job at Simon & Schuster, which he held for over two years, until his arrest in this case. PSR, ¶¶98-100.

While at Simon & Schuster, Mr. Bernardini developed a close relationship with a coworker. *See* Exhibit C. Ms. Tarkhan-Mouravi writes, "I remember him as a very smiley and friendly guy with great sense of humour who always made me laugh. Some people in the office might find his loud laughter strange, but I personally loved how he expressed himself. . . whether it was laughter or the childish curiosity to learn new things." *Id*.

Although he presented a smile to his coworkers, they could still sense a sadness about his time growing up in Italy, "I'm aware that growing up in a small town as a gay man was not easy for him. He never talked about his personal life, but I could feel he was haunted by some childhood traumas." *Id*.

**Offense Conduct**

It was during the period following his internship at Andrew Nurnberg that Mr. Bernardini began his offense conduct. He began by monitoring websites like "The Bookseller" and "Publisher's Marketplace" to learn more about recent book deals and upcoming publications. As he explained in his letter, "While employed, I saw manuscripts being shared between editors, agents, and literary scouts or even with individuals outside the industry. So, I wondered: why can I not also get to read these manuscripts? One day I created a spoof email address for someone I knew of in the publishing industry, and I sent an email to someone else that I knew of asking for a pre-publication manuscript. I wrote in the style and using the language that my former colleagues had used. When that request was successful, from that moment on, this behaviour became an obsession, a compulsive behaviour. Writing this now, I feel my fingers shaking as I type this at the thought of how egregious, stupid, and wrong my actions were." Ex. A at 2.

At the time Mr. Bernardini began his offense, he did not fully understand the impact of his conduct on the victims. *Id*. "Every time an author sent me the manuscript, I would feel like I was still part of the industry. At the time, I did not think about the harm I was causing. I never wanted to and I never leaked these manuscripts. I wanted to keep them closely to my chest and be one of the fewest to

4

cherish them before anyone else, before they ended up in bookshops. There were times when I read the manuscripts and I felt a special and unique connection with the author, almost like I was the editor of that book." *Id.*

Mr. Bernardini now fully understands how wrong and illegal his conduct was. He has expressed his sincere remorse. "I am truly sorry. . . Over the last 14 months I have felt so ashamed and disgusted with myself to the extent that I sunk into a deep depression." *Id.* Attached to this submission are numerous letters written by Mr. Bernardini's friends and family, discussing his remorse and the physical and mental manifestation of that remorse. *See* Exhibits D-K.

His partner, Ben Kaye, writes, "Filippo is truly devastated about his current situation. He is ashamed of the harm he has caused and feels he has let down those he cares about the most. I know Filippo is full of remorse for what he did, and he realizes and acknowledges the magnitude of what he has been convicted of. I am certain that together we have the strength, determination, and tools at our disposal to help him turn over a new leaf." *See* Exhibit D, Letter of Ben Kaye.

Kim Klever, the friend who offered Mr. Bernardini temporary housing after his release on bond in December 2021, writes in her letter to the Court, "It has been a difficult year for Filippo. . . Filippo has conveyed to me several times how much regret and remorse he has for his crimes and how they have impacted his victims. . . When Filippo learned that he would be in NYC for an extended period of time, we spoke about how he might make a contribution to the community as well as do something productive with his time. I helped him to select an opportunity to volunteer with City Harvest." *See* Exhibit E, Letter of Kim Klever.

Even his friends in London have seen the effects of his shame on his health. "Filippo is a complex character; very shy and sometimes withdrawn in social situations. Since his arrest, and spending time in America, he is a shell of the man he once was." *See* Exhibit F, Letter of Michaela and Daniel Foster.

Elaine and Harvey Kaye, his partner's parents, write, "we have seen (over video calls) the drastic detrimental effect that this experience has had on him – someone who was once so bubbly and vivacious has become so sad and withdrawn. We do not doubt that this is entirely due to the remorse and regret that he has for his misdeeds and his knowledge of how this has negatively impacted his victims and his loved ones." *See* Exhibit G.

In connection with our request for a deferred prosecution in this case, Mr. Bernardini was evaluated by Dr. Mary Cohen, PhD, a specialist in ▮▮▮ diagnosis and treatment.[2] As detailed in the attached report, Dr. Cohen has diagnosed Mr. Bernardini with ▮▮▮ *See* Ex. B, at 8. She also noted that Mr. Bernardini suffers from ▮▮▮ *Id.* at 8. Following a record review and extensive interviews with Mr. Bernardini, his parents, his partner, and his supervisor at his volunteering job in New York, Dr. Cohen concluded that Mr. Bernardini's ▮▮▮

Dr. Cohen notes that Mr. Bernardini's lack of social perception may have contributed to his difficulties at Andrew Nurnberg Associates.

---

[2] Dr. Cohen is Clinical Director of the Social Learning Disorders Program at the University of Pennsylvania Psychiatry Department ▮▮▮

Importantly, ███████████████████████
███████████████████████████████████



███ 9.

As Dr. Cohen's evaluation reveals, Mr. Bernardini has a long history of collecting books and stories, from his collection of nearly 400 Disney movies in childhood, to his current collection of books, which necessitated installing extra shelves in his apartment in London. *Id*. at 3. Dr. Cohen concludes that for Mr. Bernardini, "his collecting behavior regarding books and unpublished manuscripts was critical to his self-identity." Ex. B at 9. This self-identity, she explains, "was threatened when he sensed that he would lose access to manuscripts after leaving Andrew Nurnberg and was unable to secure employment in the publishing industry. He then began extreme compulsive measures to obtain these manuscripts online. *Id*. Dr. Cohen also described "the online disinhibition effect." "This is the tendency for people to feel less restrained in cyberspace and behave in a way they would never do in the real world." *Id*.



Thus, it is clear that Mr. Bernardini's offense conduct is related, in part, to his previously undiagnosed ▇▇▇. His conduct was not motivated by malice or greed, but rather a need to preserve his own identity and preserve a sense of sameness, familiarity, and well-being. The Court should consider this, as well as the lack of any financial gain to himself or loss to the authors, as mitigating factors in determining the sentence in this case.

**Sentencing Guidelines**

The parties agree that the total offense level is 14 and Mr. Bernardini is in criminal history category I, with a corresponding Guideline range of 15 to 21 months. It is worth noting that the offense level was increased by 6 levels because the "loss amount is $88,000." PSR, ¶32. The loss in this case in not based on any decrease in value of any author's work, nor on any monetary gain to Mr. Bernardini. Rather, the full amount of the loss derives from legal and expert fees incurred by Penguin Random House in connection with the offense. Mr. Bernardini intends to make full restitution as soon as he can. Without the 6-level increase based on loss amount, the total offense level would be 9, yielding a guideline range in Zone B.

In *United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016), the Second Circuit encouraged district courts to consider a downward variance in situations similar to the instant case: "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." Thus, the Court can, and should, consider a downward variance for this reason.

**Immigration Consequences**

Mr. Bernardini's arrest has derailed his long-term plan to seek citizenship in his adopted home, the United Kingdom. PSR, ¶64. As an EU citizen who has been granted "Settled Status," Mr. Bernardini has "Indefinite Leave to Remain" ("ILR") in the UK (comparable to legal permanent residence in the United States) which normally entitles him to seek British citizenship after five years of continuous residence. PSR, ¶64. However, Mr. Bernardini may not apply for citizenship if he has spent more than 90 days of the past twelve months outside of the UK. Since Mr. Bernardini has already spent fourteen months outside of the UK as a condition of his pretrial release, he will now have to wait several years after his return to the UK to seek citizenship.[6] In addition, even a non-custodial sentence will result in a

---

[6] *See* Gov.UK, *Apply for citizenship if you have indefinite leave to remain or 'settled status'*, (last accessed May 11, 2022) https://www.gov.uk/apply-citizenship-indefinite-leave-to-remain.

three-year bar on citizenship.[7]

These immigration consequences come in addition to those Mr. Bernardini already faces in the United States simply by virtue of having been arrested at JFK Airport and paroled into the country. PSR, ¶64. Here, Mr. Bernardini faces detention and deportation upon resolution of this matter, followed by an indefinite, if not permanent, discretionary bar on his return to the United States.[8]

Though Mr. Bernardini wishes to return to London as soon as possible and does not seek permission to remain or return to the United States, his lack of future access to educational and professional opportunities in the United States constitutes an additional form of punishment. *See United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate 'just punishment' if it does not consider the collateral effects of a particular sentence.")*Id*. at 141-142; *see also United States v. Thavaraja,* 740 F.3d 253, 262-3 (2d Cir. 2014) (deportation is a permissible §3553(a) factor).

**<u>A prison sentence is not necessary to afford specific or general deterrence.</u>**

The Court must consider both specific and general deterrence when imposing sentence. *See* 18 USC §3553(a)(2)(B). The stigma of a felony conviction, along with the shame Mr. Bernardini has experienced over the past 14 months, have specifically deterred him from ever committing any similar offense in the future. He has been isolated in a foreign country, separated from both his family of origin in Italy and his chosen family in London, his partner, Ben, and his beloved dog, Dolly. His every movement has been monitored since his arrest at JFK on January 5, 2022. In characteristically literary terms, Mr. Bernardini observes that "My name will always be associated with this crime. It is my scarlet letter and I will carry it for the rest of my life." Ex. A at 4.

---

[7] Based on consultation with immigration counsel in the UK, Ms. McCrea was informed that a non-custodial sentence will trigger a three-year bar on citizenship, a custodial sentence of less than twelve months will trigger a ten-year bar on citizenship, a custodial sentence between twelve months and four years will trigger a fifteen-year bar on citizenship, and a custodial sentence greater than four years will trigger a permanent ban on citizenship.

[8] As Mr. Bernardini is likely classified as an "arriving alien" (alien seeking admission) under 8 U.S.C. § 1225(a)(1), upon resolution of this matter he intends to seek permission from the Department of Homeland Security ("DHS") to withdraw his application for admission and depart voluntarily. *See* 8 U.S.C. § 1225(a)(4); 8 CFR § 1235.4. If DHS declines to grant that permission, Mr. Bernardini will likely be ordered deported.

Mr. Bernardini has indeed suffered professional and reputational ruin. He lost his job at Simon & Schuster and is effectively banned from the publishing industry. This outcome is particularly painful for Mr. Bernardini, who dreamed of a career in publishing and whose offense conduct in this case relates directly to his desire to feel like an industry insider. Moreover, the constant stream of media attention, including several invasive profiles of his life and childhood, has caused Mr. Bernardini and his loved ones deep pain and humiliation.

To anyone following this case in the media, Mr. Bernardini's experience is a cautionary tale. He lost his job and his ability ever to work in publishing again. He lost his ability to work at all for more than a year which has left him without savings. He caused pain to his family and friends. He gained nothing financially from his crime and now must pay tens of thousands of dollars in restitution. For more than a year, he was prevented from returning to his home and separated from his loved ones. For more than a year, he could not travel anywhere without the knowledge and permission of his pretrial officer. He has fallen into a deep ███████████████████████████████████████. Moreover, because of the unique nature of the offense and the publishing industry's response, any future attempts to unlawfully obtain pre-publication manuscripts are unlikely to be successful.

In an article written last month about "the manuscript thief," the journalist observed, "The manuscript thief was one of those weird stories, like Tiger King, that generated a ridiculous amount of attention during the pandemic." *See* Kenneth Whyte, *How a manuscript thief conned the publishing world and set off an FBI manhunt* (February 5, 2023).[9] After noting that Mr. Bernardini's "deeds were accomplished 'without extorting a penny. . .and without procuring any advantage for himself other than to read a book before it went to print,'" the journalist reached out to one of the more high profile "intended victims" for her views. *Id*. The article concludes with several quotes from Margaret Atwood: "He certainly caused folks to waste a lot of time. . .though he did inspire an entertaining game of Whoever Can It Be." She imagined a "literary punishment" for Mr. Bernardini being "doomed to toil with great earnestness at very long, complicated, and charmless novels featuring talking gerbils that are, however, always rejected by publishers." *Id*.

---

[9] https://nationalpost.com/entertainment/books/manuscript-thief-conman-scammer-fbi-manhunt

**The Court should consider Mr. Bernardini's vulnerability to abuse in prison.**

As set forth in her report, Dr. Cohen warns that Mr. Bernardini would fare very poorly in a prison setting for several reasons: Mr. Bernardini's "intense social anxiety and inability to understand social situations would make him particularly vulnerable to abuse in a prison environment," noting that he "would not be able to read the motivations of inmates and would not understand how to protect himself." Ex. B at 10. She adds that his ▮▮▮▮▮▮▮▮▮▮▮▮ are exacerbated by cultural differences and his unfamiliarity with American culture." *Id*. Separate and apart from Mr. Bernardini's ▮▮▮ and cultural barriers, according to Department of Justice statistics, LGBTQ-identifying inmates experience dramatically higher rates of sexual violence in prisons.[10]

Several of Mr. Bernardini's friends and family members have expressed their concern for his safety if incarcerated. His partner writes, "I am terrified about what may happen to Filippo if he is incarcerated. Filippo – a homosexual, ▮▮▮▮▮ Italian man will not do well in a US jail. He will have very few if any visitors. But what terrifies me most is the prospect of Filippo being bullied or suffering physical, mental or even sexual abuse. Ex. D; *see also* Ex. C, Letter of Nino Tarkhan-Mouravi, "[h]e was like a curious child. . . prison isn't the place where he belongs. Knowing him and his fragile and insecure personality, I believe such punishment would be disastrous for him and would totally break him down."

Even one of the authors whose manuscript was stolen has written to the Court to express his opinion that "[f]or a person like Mr. Bernardini, who as I understand may even be ▮▮▮▮▮▮▮▮▮, a trip to prison would be a traumatizing and unhelpful punishment." *See* Exhibit H, Letter of Jesse Ball.

As described on the Penguin Random House website, Jesse Ball is the author of fourteen books, including the novel, *How to Set a Fire and Why*. *See* https://www.penguinrandomhouse.com/authors/73835/jesse-ball/. Although Penguin Random House is seeking restitution for its legal fees, Mr. Ball adamantly opposes any additional punishment for Mr. Bernardini: "I feel that Filippo Bernardini should be given the absolute minimum punishment possible. *Under no condition whatsoever should he, on my behalf, be given prison time.* The crime of loving books, and of loving intrigue, and of mixing up (on the internet) what is real and what is

---

[10] *See* Allen J. Beck et al., *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2011-12, DOJ Bureau of Justice Statistics (2013) https://bjs.ojp.gov/library/publications/sexual-victimization-prisons-and-jails-reported-inmates-2011-12-update (reporting that 1.2% of heterosexual inmates report inmate-on-inmate violence, compared to 12.2% of non-heterosexual inmates)

imagined is, in this case, a slight one. . . Sending a man to prison over this would be a way to take a victimless crime and create a victim in the person of the accused." (emphasis in the original). Ex. H.

**Plans for the future**

Mr. Bernardini has been in full compliance with the strict conditions of release during the past fourteen months. PSR, ¶5. He has actively participated in court-ordered mental health treatment weekly. PSR, ¶78. In addition to this court-ordered treatment, Mr. Bernardini has voluntarily participated in bi-monthly therapy sessions with a counselor in the United Kingdom to address his ▮▮▮▮, offense conduct and his childhood. PSR, ¶79.

Mr. Bernardini is committed to continuing mental health treatment upon his return to London. He is fortunate to live in the United Kingdom, which is at the forefront of ▮▮▮▮ research and treatment. Mr. Bernardini lives not far from the



Ex. B at 10.

Mr. Bernardini writes, "When I go back home to London, the first thing I want to do is look after my mental health to prevent any similar incident from happening again." Ex. A at 3. He will also have the loving support of his partner who is "committed to helping Filippo find and engage with resources and professional support in the UK that is directly catered to people with his type of ▮▮▮▮." Ex. D at 3.

Attached to this submission are numerous letters from Mr. Bernardini's family in Italy as well as his London family. *See* Exhibits I-L. Although Mr. Bernardini's relationship with his mother and father has been a source of trauma and conflict for him, he has been warmly embraced by his partner's family and large circle of friends. Elaine and Harvey Kaye consider him like "a second son." Ex. G.

The letter from Samantha Butcher gives the Court a sense of the community waiting for Mr. Bernardini in London. *See* Exhibit I. She is his partner's cousin. Her children (who have signed the letter to the Court) consider him their "beloved uncle" and it has been a "traumatic loss for them" to be separated for so long from him. She writes of how, in the weeks following his arrest and detention in the United States, her family "FaceTimed every day so that Filippo and Dolly [his beloved dog] could see each other, it was heartbreaking. We saw how moved Filippo was to not be able to be with the closest thing he has to a child." *Id.*

Ms. Butcher adds "I work with. . . 20 children with ████████████████████████████████████████████ and his actions were not of malice, but linked to his disorder which simply got out of control. We are here to fully support him when he comes home and help him rebuild his life here. My girls just want their Uncle Filippo back." *Id*.

Mr. Bernardini has already begun to imagine what his rebuilt life outside of the publishing world will look like. Many of the letters from friends and family talk about his skills as a chef. He is hoping to begin "working within the food industry, potentially to open a health café in London where I can serve healthy, organic, meat-free dishes, including specific cakes for people who have food allergies and intolerances that can help them to maintain a healthy diet." Ex. A at 3-4; PSR, ¶97.

In addition, given his linguistic talents, Mr. Bernardini has expressed an interest in "teaching English to the Chinese community within my neighborhood in London." Ex. A at 4. He has experience tutoring from his time in college in Milan, where he helped his peers improve their Chinese. *See* Ex. M at 1.

Finally, Mr. Bernardini is interested in learning more about ██████. Ex. A at 4. He has just begun the process of understanding what this new diagnosis means for him and for his future.

## Conclusion

Mr. Bernardini violated the trust of many people with his deceit and his misrepresentations. For this he has already been punished and punished severely. He will live with the consequences of his actions for the rest of his life. As he wrote, "the cruel irony is that every time I open a book, it reminds me of my wrongdoings and what they led me to." Ex. A at 4. A custodial sentence would be "greater than necessary" to satisfy any of the statutory purposes of sentencing.

For all the reasons set forth above, I ask the Court to impose a sentence of time-served with a restitution order of $88,000, which will allow Mr. Bernardini to return to his home in London and to begin making restitution payments immediately.

Respectfully submitted,

*/s/ Jennifer Brown*
Jennifer Brown
Attorney-in-Charge
Federal Defenders of New York
(646) 763-1420