

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 17, 2023

**BY ECF**

The Honorable Colleen McMahon
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Filippo Bernardini*, S1 21 Cr. 458 (CM)

Dear Judge McMahon:

    The defendant in this case, Filippo Bernardini, is scheduled to be sentenced on March 23, 2023 at 12:00 p.m., having pleaded guilty to wire fraud, in violation of 18 U.S.C. § 1343. The Government respectfully submits this letter in advance of sentencing.

    For more than five years, continuing until his January 2022 arrest, Bernardini planned and executed a massive scheme to impersonate hundreds of people and steal more than a thousand unpublished manuscripts. The victims of his crime are real people, employed in the global publishing industry. His impersonation and theft caused real reputational, emotional, and financial harm to his victims. In addition to this impersonation scheme, which required the creation of more than a hundred fake domains, he also stood up a spearphishing scheme that allowed him to harvest victims' usernames and passwords. He continued in this criminal conduct for years, even as his victims confronted him, accusing him of theft and crimes, and even as his scheme attained public notice.

    For those reasons and as explained in greater detail below, the Government believes that an incarceratory sentence of at least one year is appropriate in this case.

    **I.**    **Background**

        **A. Offense Conduct**

    Beginning in at least August 2016, the defendant began his long-running scheme to impersonate individuals involved in publishing and use that identity theft to steal unpublished manuscripts.

    Bernardini is an Italian citizen who resided in the United Kingdom. At the time he began the scheme, he worked as a foreign rights intern at a literary agency in London. With the exception of an approximately five-month period between in or about October 2016 and in or about March

2017 and another approximately six-month period between in or about March 2018 and in or about September 2018, during the course of the scheme, Bernardini consistently held roles in the publishing industry. Most recently, and until his arrest, Bernardini served as a Rights Coordinator for a major, U.S.-based publishing house ("Publisher-1"). Bernardini also worked as a translator of written materials.

The primary method of fraud pursued by Bernardini involved the use of false domains and impersonation. Bernardini registered more than 160 look-alike internet domains in the course of the scheme. These fraudulent domains appeared similar to the real entities they were designed to impersonate but had minor differences that would be difficult for a recipient to notice in a cursory review. For example, Bernardini often substituted the letter <**m**> with the two letters <**rn**> or the letter <**g**> for the letter <**q**>.

In this scheme, Bernardini would use these look-alike domains and create fake email accounts impersonating actual agents, scouts, and publishing executives. Using these impersonating accounts, Bernardini drew upon his knowledge of relationships and conventions in the publishing industry to request copies of unpublished manuscripts, pretending he was the person whose identity he had stolen.

Over the course of the scheme, Bernardini impersonated at least hundreds of distinct people. And he successfully obtained more than one thousand unpublished manuscripts, and attempted to obtain many more. The manuscripts Bernardini obtained and attempted to obtain covered a broad range of written work. Some were fiction, others were memoir. Some were forthcoming works by established, well-known authors, while others were rather obscure books written in a number of foreign languages.

Bernardini used a number of primary email accounts to manage the scheme. One of these, "Email Account-1" received much of the traffic of his activities, with the look-alike domains forwarding email traffic to Email Account-1. Email Account-1 is thus a store of a massive volume of this more than five-year fraud scheme.

In addition to the impersonation scheme, Bernardini created a phishing scheme involving login information to a database ("Database-1") maintained by a New York City-based literary scouting company ("Scouting Company-1"). First, from in or about December 2019 through in or about April 2020, Bernardini impersonated employees of Scouting Company-1 and emailed individuals with Database-1 accounts. In these emails, Bernardini represented that Scouting Company-1 was updating Database-1 to make it more usable, and Bernardini requested that the email recipients provide their username and password for Database-1. Some of these recipients responded with this information.

Second, in or about July 2020, Bernardini created malicious web pages that were designed to resemble the landing page of Database-1. These look-alike webpages were programmed to include a script that forwarded user-inputted information to Bernardini. Bernardini sent emails from a look-alike Scouting Company-1 email account that directed recipients to follow a hyperlink to the look-alike pages and update their Database-1 passwords for security reasons. When a user

followed the link and inputted his or her username and password, the script forwarded this login information to Bernardini. Based on a search of Email Account-1 and a second email address used by Bernardini ("Email Account-2"), it appears that Bernardini used his stolen access to Database-1 to copy and obtain scouting reports created by Scouting Company-1 employees.

### B. Procedural History

On July 14, 2021, a grand jury returned Indictment 21 Cr. 458 (CM), charging Bernardini with wire fraud and aggravated identity theft. (Dkt. No. 2.) On January 5, 2022, Bernardini landed at John F. Kennedy International Airport, where he was arrested by law enforcement. Bernardini was presented the following day, on January 6, 2022, when he was ordered released subject to bail conditions.

On January 6, 2023, Bernardini waived indictment and was arraigned on Superseding Information S1 21 Cr. 458 (CM) (Dkt. No. 28). The Superseding Information charged Bernardini solely with wire fraud and expanded the time frame of the offense as compared to the initial Indictment. Also on January 6, 2023, Bernardini pleaded guilty to the Superseding Indictment, pursuant to a plea agreement and before Magistrate Judge Sarah Netburn.

Pursuant to the parties' plea agreement, the parties stipulated to an offense level of 14 and a Criminal History Category of I, resulting in a Guidelines Range of 15 to 21 months' imprisonment. On March 14, 2023, the Court accepted the defendant's plea in a written order. (Dkt. No. 36.)

## II. Discussion

### 1. Applicable Law

Following *United States v. Booker,* 543 U.S. 220 (2005) and *United States v. Crosby,* 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker,* 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

Hon. Colleen McMahon
March 17, 2023
Page 4 of 8

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### 2. A Sentence of At Least One Year Is Sufficient and Not Greater Than Necessary

A sentence of at least one year imprisonment is appropriate but not greater than necessary to comply with the purposes of sentencing. The factors most relevant to imposing sentence include the seriousness of the defendant's offense, the need to promote respect for the law, and the need to afford adequate deterrence to criminal conduct.

*The Defendant Engaged in a Long-Running, Sophisticated Crime*

The defendant's offense is indisputably serious. The defendant's submission and much of the media attention this case has received has focused on *why* the defendant committed the offense. That is of course a relevant consideration for the Court in imposing sentence. But *what* the defendant did is as, if not more, important.

Here, the defendant engaged in a sophisticated impersonation scheme for more than five years. He used the identities of hundreds of victims and targeted hundreds more, successfully stealing more than one thousand manuscripts. His phishing scheme involving Scouting Company-1 was even more complex than the web of look-alike domains he created and maintained. His scheme required planning and research. It was no momentary lapse in judgement, but was something he continued for years. Every step along the way, with every impersonating email, the defendant lied to obtain these valuable manuscripts.

The defendant seems to assert that his crimes arise from a need to remain exposed to the publishing world even as he ceased to work in the publishing field. (Def. Mem. 4) But this explanation does not hold water, as the defendant began the scheme while he worked in publishing, and he worked in publishing for the majority of his criminal conduct, and presumably remained exposed and had access to the field. And other justifications offered by the defendant, while they may contextualize his offense, do not excuse the years of focused, continuous criminal activity.

### Bernardini Harmed His Victims

The defendant's conduct caused real harm to victims. Some of those victims have submitted victim-impact statements to the Court. Most severely, one of the victims ("Victim-1") describes the harm suffered by being falsely accused as the person behind manuscript theft. (Victim Impact Statements ("VIS") 8-9.) Victim-1 is a literary scout. Bernardini created a look-alike domain impersonating Victim-1. He also used Victim-1's name as the display name for Email Account-2, one of the email accounts Bernardini created to coordinate the scheme. Victim-1 was falsely identified as the thief. Vicitm-1 writes "I am still suffering professional consequences from Bernardini's schemes: over the years I have lost business opportunities, and international publishers have decided not to hire me because . . . they had heard the aforementioned rumors, according to which I was the impersonator." (VIS 8.)

Other victims describe the emotional and psychological harm caused by the defendant's conduct. Another victim ("Victim-2") describes sleepless nights and months of emotional anguish and insecurity following the defendant's successful theft of a manuscript in Victim-2's care. (VIS 6.) Victim-2 suffered from self-blame—"It was my fault, and I didn't know what to do"—as a result of the defendant's crime. Another victim ("Victim-3"), a translator who was impersonated writes that Bernardini's "malicious actions caused me anxiety, shame, sense of vulnerability, guilt and loss of reputation—in a field where reputation is essential." (VIS 2.)

Another victim ("Victim-4") describes her reactions to the defendant's theft of Victim-4's unpublished manuscript, a book Victim-4 had spent years working on. Victim-4 writes "in the immediate aftermath of the theft, the book seemed ruined to me, and I felt little will to continue working on it." (VIS 11.) "A private, buoyant sense of hope that I'd had for years about [the stolen manuscript], vanished with the theft. What replaced it were persistent feelings of failure, anxiety and dread. I blamed myself for having fallen for the scheme, and relentlessly revisited my email exchange with the thief. He continued to contact me in the guise of my editor, trying to use me to gain access to another [publishing house] author. These creepy emails were sickening reminders of my failure to protect my work." (*Id.*)

To be sure, some victims have stated that the defendant's conduct did not cause them substantial harm, or even that they found the defendant's criminal conduct amusing. It is not surprising that a crime targeting hundreds if not more than a thousand people—serving in different roles and with different levels of success and experience—would trigger a range of responses and harms. Nevertheless, the Court should consider the substantial harm that the defendant's conduct caused at least some of his victims in weighing the severity of his conduct and fashioning sentence.

### Bernardini Continued Even as the Harm Was Obvious

Adding to the severity of the defendant's offense is that he continued engaging in it even in the face of years of complaints and responses that made blatantly clear that what he was doing was harmful and criminal. Exhibit A to this submission includes a selection of emails sent and received by the defendant over the course of the fraud scheme.

Hon. Colleen McMahon
March 17, 2023
Page 6 of 8

For example, as early as 2017, the defendant received emails accusing him of identity theft, fraud, and impersonation. (Ex. A, at 1, 2.) In 2018, he received an email from a major talent agency ("Agency-1") stating that the defendant had "been fraudulently impersonating [Agency-1] personnel. (Ex. A, at 3.) This email threatened that Agency-1 was "prepared to report your fraudulent activities to criminal justice authorities and to initiate formal legal action against you related to the same." The email attached a formal cease and desist letter with explicit demands. (Ex. A, at 5.)

In May 2020, after successfully stealing another manuscript, the defendant received an email reading "Delete the file immediately. I've been informed you are a scam address. This is shameful. You could put this author's project at serious risk." (Ex. A, at 28.) Despite these repeated warnings of the harm and consequences of his conduct, Bernardini continued with it for years. His current claim that he did not realize the possibility that he was causing his victims harm is incredible.

And, in February 2021, a victim ("Victim-5") publicized that he had fallen victim to the defendant's scheme. The defendant reached out to Victim-5, writing "I'm sorry for taking your identity" and "I won't do it again." (Ex. A, at 35.) Nevertheless, the defendant continued to utilize the identities of others to fraudulently obtain manuscripts.

These sampling of communications, sent over the course of years and at least as early as 2017, did nothing to blunt the defendant's activities or make him reconsider the harmfulness of his theft scheme.

*Bernardini Was Cruel and Manipulative to His Victims*

Not only was Bernardini undeterred by his victims' words and reactions, but the actual manner he employed to deceive and steal from his victims also shows that he treated his victims with little to no regard.

Emails show the defendant toying with his victims, utilizing their concern of the very scheme he was engineering as a way of ingratiating himself and obtaining stolen manuscripts. For example, in a March 2019 email, the defendant, impersonating a translator, claims he must receive a particular book extract so he can confirm his counterparty is not the impersonator. (Ex. A, at 7.) And in an April 8, 2020 email, the defendant expresses confusion at the resurgent theft attempts— "Oh dear, again???" (Ex. A, at 24.) Obviously, as the impersonator, the defendant simply utilized other's suspicion and concern to gain their trust and obtain manuscripts.

In other communications in April 2019, the defendant, attempting to gain a copy of a forthcoming book by a high-profile novelist ("Novel-1"), writes, in response to thieving concerns expressed by his counterparty ("Victim-6"), "Again with this hacking thing???" The defendant was so intent on obtaining this manuscript from Victim-5 that, at approximately the same time as these April 2019 exchanges with Victim-6, the defendant utilized a different stolen identity to contact Victim-6 and work to trick Victim-6 into sharing Novel-1. In this second email chain, the defendant wrote to Victim-6 with a "phishing alert update," claiming that an attempted theft had

been uncovered and authorizing Victim-6 to "share with your colleagues . . . only the first 67 pages of the first version of [Novel-1] just to give them an idea of the novel." (Ex. A, at 20.) This lie worked, as Victim-6 conveyed to the defendant, on the initial email communications, that Victim-6 could in fact share 67 pages of Novel-1. (Ex. A, at 9.)

The defendant could also be angry and mean in dealing with his victims. In August 2020, the defendant worked to obtain a particular manuscript ("Novel-2"), but was identified by his victims as an impersonator. A victim ("Victim-7") told the defendant to stop his identity theft and fraud conduct. The defendant responded by calling Victim-7 a "cunt." (Ex. A, at 32.) He also taunted Victim-7 by stating that he had successfully obtained Novel-2 and quoted from the beginning of the book. There is no plausible basis to argue that he did not realize the wrongfulness of his conduct during the many years he was engaged in it—he simply did not care.

### *The Guidelines do not Overstate Bernardini's Crime*

That the defendant does not seem to have done anything with the manuscripts he stole does not nullify the harmfulness of his conduct. To be sure, this is an unusual case. The Court should certainly consider the nature of the stolen property here. But the Court should not let the atypical nature of the stolen property abstract away the social harms of the defendant's crime. By comparison, if the defendant had stolen money from his victims but did not spend it, practically everyone would still view the conduct as serious. And even in cases where the theft of property is not a zero-sum game where the victim is denied access and ownership, the theft itself is still serious and worthy of reproach. For example, if the defendant had stolen credit card or other personally identifying information from his victims but did not use that stolen information to benefit himself, his conduct would near uniformly be perceived as serious. The novelty of the property in question here should not diminish the real impact of the defendant's years of criminal conduct.

The defense further argues that the Guidelines overstate the defendant's culpability because the loss does not relate to his gain. (Def. Mem. 8.) The loss here relates to one corporate defendant's costs in remediation as a result of the defendant's conduct. Insofar as financial loss largely drives the offense level under Section 2B1.1, however, the Guidelines do not directly address the more pernicious harm caused by the defendant's conduct, namely, his rampant identity theft and theft of manuscripts, many of which held great material and emotional value to their owners. That harm is difficult to quantify, but it is plainly extensive. The defendant deliberately and systematically took part in this conduct for more than five years.

### *The Court's Sentence Should Promote Deterrence*

The Court should also consider the need to promote specific deterrence in imposing sentence. The defendant engaged in the instant conduct for more than five years, impersonating hundreds of victims, and targeting hundreds more victims. He was not deterred from this conduct despite repeated warnings, complaints of the harm he was causing, and threats of law enforcement involvement. He showed a knack for impersonation and took substantial steps to accomplish this scheme. The Court's sentence should work ensure that the defendant not resume his identity theft and stealing conduct.

General deterrence and the need to promote respect for the law are also significant concerns motivating the Government's sentencing position. The Court's sentence should make clear to the defendant and others who might consider engaging in similar identity theft and fraud conduct that these type of offenses, launched from the security and remove of a keyboard but causing real harm, are unacceptable.

### III.     Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of at least one year.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by:  /s/_____
     Daniel G. Nessim
     Assistant United States Attorney
     (212) 637-2486