N3NCberS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          21 Cr. 458 (CM)

5    FILIPPO BERNARDINI,

6                 Defendant.

7    ------------------------------x

8                                       New York, N.Y.
                                        March 23, 2023
9                                       12:00 p.m.

10
     Before:
11
                         HON. COLLEEN McMAHON,
12
                                          District Judge
13
                              APPEARANCES
14
     DAMIAN WILLIAMS,
15        United States Attorney for the
          Southern District of New York
16   BY:  DANIEL G. NESSIM
          Assistant United States Attorney
17
     DAVID PATTON
18   FEDERAL DEFENDERS OF NEW YORK
          Attorney for Defendant
19   BY:  JENNIFER BROWN

20
     ALSO PRESENT:  LARISSA ARCHONDO, Federal Defenders Paralegal
21

22

23

24

25

N3NCberS

```
1              (Case called)

2              MR. NESSIM:  Good afternoon, your Honor.  Daniel

3   Nessim for the government.

4              THE COURT:  Hello, Mr. Nessim.

5              MS. BROWN:  Good afternoon, your Honor.  Jennifer

6   Brown from Federal Defenders for Mr. Bernardini.  At counsel

7   table is Larissa Archondo, one of our paralegals.

8              THE COURT:  Good afternoon.  Matter is on for

9   sentencing under docket No. 21 Cr. 458, United States of

10  America v. Filippo Bernardini.  The defendant having been found

11  guilty by plea to one count of wire fraud, a class C felony, in

12  violation of 18, United States Code, Section 1343.  This crime

13  carries a statutory maximum penalty of 20 years' imprisonment,

14  three years supervised release, a maximum fine of the greatest

15  of $250,000, or twice the gross pecuniary gain the defendant

16  derived from the offense or twice the gross pecuniary loss to

17  persons other than the defendant, and a $100 mandatory special

18  assessment.

19             In connection with today's proceeding, I have received

20  and reviewed the presentence investigation report, prepared by

21  United States probation officer Crystalyn Meyers.  It was filed

22  on March the 17th with the Court.  I have a letter on the

23  letterhead of the United States Attorney's Office for the

24  Southern District of New York in the nature of a sentencing

25  memorandum.  And I have a very, very large submission of emails
```

N3NCberS

| 1 | from various people who were involved in trying to figure out |
| 2 | who the defendant was and why he was impersonating them, and I |
| 3 | now have six because I got one this morning, of victim impact |
| 4 | statements, five submitted by the government and one was |
| 5 | submitted by the defense, so a total of six victim impact |
| 6 | statements.  I have a letter, dated March 10, 2023, on the |
| 7 | letterhead of the Federal Defenders of New York in the nature |
| 8 | of the defendant's sentencing memorandum from Ms. Brown, and |
| 9 | attached to it are a large number of exhibits, A through F, a |
| 10 | number of letters in support of the defendant, some information |
| 11 | about an evaluation that was done of him by a forensic |
| 12 | psychologist, a letter from the defendant himself, all of those |
| 13 | attached to the Federal Defenders sentencing memorandum.  I've |
| 14 | also been given a consent order of restitution, which was |
| 15 | handed up to me this morning. |
| 16 |          Is there anything else I should have seen in writing |
| 17 | prior to today's proceeding from the government? |
| 18 |          MR. NESSIM:  Your Honor, we've also handed up a |
| 19 | judicial order of removal and supporting documentation. |
| 20 |          THE COURT:  Okay.  I've actually never seen one of |
| 21 | these before. |
| 22 |          MR. NESSIM:  Your Honor, I believe the Court was |
| 23 | complete with the victim impact statements, but just to |
| 24 | confirm, I believe there were six submitted by the government, |
| 25 | including the one this morning. |

N3NCberS

1          THE COURT:  The government submitted the one this

2     morning?

3          MR. NESSIM:  Yes.

4          THE COURT:  Fine.  All right.  That wasn't clear since

5     it was simply handed to me and the victim did not want the

6     defendant to go to jail.

7          MR. NESSIM:  Yes, your Honor.  I received it by mail

8     from Norway as I was walking over to court.

9          THE COURT:  Thank you so much, Mr. Nessim.

10          Anything else I should have seen in writing from the

11     defense?

12          MS. BROWN:  No, your Honor.

13          THE COURT:  Thank you, Ms. Brown.

14          Has the government reviewed the presentence report?

15          MR. NESSIM:  Yes, your Honor.

16          THE COURT:  Any additions, deletions, or corrections

17     that you wish to make?

18          MR. NESSIM:  No, your Honor.

19          THE COURT:  I will hear the government on sentencing.

20          MR. NESSIM:  Thank you, your Honor.

21          As was set forth in our submission, we believe that a

22     sentence of at least one year is appropriate here.  A lot has

23     been written about this case, the Court's remarked on it in

24     prior proceedings.  There's a lot of questions about why the

25     defendant did what he did, but the conduct that he committed

N3NCberS

1    was incredibly long-running and sophisticated.  I just want to

2    highlight a few components of that.

3            So the defendant maintained more than 160 lookalike

4    domains, and that's just the domains, that's not just the

5    individuals who were impersonated.  Some of those domains were

6    some major publishing houses, like Penguin Randorn House with

7    the "rn" instead of the "m" or Sirnon & Schuster.  But many of

8    those were individual, small entities publishing houses,

9    translators, scouts, agents from all over the world.  So the

10   amount of work and planning that went into preparing those

11   domains, leasing them, paying for them, maintaining them, much

12   less learning who worked at these places and who he could

13   impersonate was quite significant.

14           He impersonated hundreds, if not more than a thousand

15   individual people.  He successfully obtained more than a

16   thousand manuscripts and attempted to obtain many more.  Each

17   email, each attempt at obtaining these manuscripts involved a

18   tremendous amount of lying, a tremendous amount of planning,

19   and this went on for years, more than five years.

20           And as we put forward in our submission and attached

21   some of those emails to the Court, the defendant had ample

22   warnings as to what he was doing was illegal, that it was

23   harming people, that it was menacing conduct, cruel conduct,

24   threatening conduct.

25           Also, the spearfishing scheme, which is separate from

N3NCberS

1    his impersonation, sort of social-engineering-type scheme is

2    even more sophisticated.  He set up these fake internet landing

3    pages that resembled a legitimate database.  He installed

4    malicious software on those internet pages to harvest people's

5    user names and passwords.

6         In no way was this sort of a passing hobby, a desire

7    to read books, a desire to collect books, something so

8    harmless.  This is years of conduct that is manipulative, that

9    is fraudulent, that involves stealing other people's identities

10   and trading on them to obtain things of value.

11        And the manuscripts, too, we mention them in our

12   sentencing submission.  Obviously, it's a unique case.  The

13   Court has not seen a case like this, I imagine, before.  But,

14   you know, the property at issue here has value, and it has

15   meaning to the people from which it was stolen.  These

16   manuscripts were either in the possession of people who were

17   responsible for safeguarding them, who could risk contractual

18   liability, financial penalties, if it came out that they were

19   responsible for leaking --

20        THE COURT:  Right.  They were lucky that none of that

21   happened.

22        MR. NESSIM:  That's true.  And also people who spent a

23   tremendous amount of effort building these manuscripts, writing

24   them, working on them, fine tuning them, and the thefts were

25   harmful to those people.  And some of those victim impact

N3NCberS

1    statements speak –– deserve the emotional and psychological

2    harm of the defendant's conduct.  We have some comparisons in

3    our sentencing submission of if he was stealing personal

4    identifying information and not using it, that's still

5    incredibly problematic, and the social harm.  If he's stealing

6    nude photos, using sort of social engineering messes to obtain

7    nude photography of his victims, something similarly personally

8    intimate, like an in-progress manuscript and not doing ––

9               THE COURT:  I don't equate those two.

10              MR. NESSIM:  Well, they're obviously not the same,

11   your Honor, but just the fact that he did not resell them

12   doesn't make it harmless.  Stealing them ––

13              THE COURT:  I understand.  I mean, people were upset.

14   I, of course, have nothing to do with the publishing industry,

15   so I was not aware that this was a problem for years in the

16   publishing industry as people tried to figure out who was doing

17   this.  Lots of people seemed to know that somebody was taking

18   manuscripts and nothing was happening to them, they weren't

19   being posted on the internet or anything like that.  It seems

20   to have been kind of a "Where in the World is Carmen San Diego"

21   thing in the publishing industry to try to figure out what the

22   heck was going on for a long time.  I knew none of that until I

23   read all this stuff.

24              MR. NESSIM:  Yes, your Honor.  I think that's right in

25   sort of the novelty of that story should distract from the

N3NCberS

1  years and what the defendant did here.  As a question of why, I

2  don't think we'll ever know exactly why he did what he did.  I

3  don't think it's worth drawing too much on motive because I

4  think it is still a mystery.

5          The claim that it's just to read books is not

6  consistent with the conduct here.  He's collecting more than

7  just books.  He's manipulating his victims, he's toying with

8  them.  I think the most recent victim impact statement sort of

9  has an interesting section on this.  I'll just read from it for

10  a moment.

11          "Much has been said about Mr. Bernardini's crimes

12  being apparently victimless, but for me and the other

13  translators he duped, this is not the case.  Under false

14  pretenses, he commissioned me to do work for which he knew I

15  would never be paid.  I do wonder why he did this.  Did he plan

16  to use the reports for his own gain in some way or was it

17  simply for the satisfaction for knowing that he had caused me

18  to waste hours of my valuable time.  I do not believe that

19  Mr. Bernardini's crimes were simply motivated by a desire to

20  being among the first to read unpublished works of literature.

21  I believe he enjoyed pretending to be figures in the publishing

22  industry and that he relished the thrill of exercising control

23  over industry participants.  I think he enjoyed the feeling of

24  fooling and embarrassing people like me.  After all, he

25  attempted to deceive me multiple times by pretending to be

N3NCberS

1      three different people.  It is clear to me that there was a

2      certain degree of malicious intent here, and Mr. Bernardini's

3      aggressive, threatening responses to those who discovered what

4      he was doing only substantiate this."

5           And victim 1, who was included in the victim impact

6      statement, he was the scout who was mistakenly accused as being

7      the impersonator.

8           THE COURT:  He's the one I'm really concerned about, I

9      have to say, because even, for example, the person who wrote

10     and gave it to me in the last hour, because you just got it in

11     the last hour, says what you read and then says "I hope he

12     doesn't go to prison."  We have this other individual who was

13     wrongfully accused and -- I can't say I'm moved by the

14     six-point enhancement for Penguin's legal fees, I'm unmoved by

15     that, but I am moved by the fact that there's a guy out there

16     who can't quantify the injury that he has suffered

17     professionally, but who clearly has suffered an injury to his

18     ability to work because people thought he was the person who

19     was doing what Mr. Bernardini was doing and he lost

20     opportunities and we'll never know how many.

21          MR. NESSIM:  Yes, your Honor, that's right.  He

22     suffered real harm and he is just one of the hundreds of

23     victims in this case.  The Court is obviously not imposing the

24     victim's will here today.  The Court is obviously considering

25     the case before it and considering an appropriate sentence.

N3NCberS

|  |  |
|---|---|
| 1 | The fact that certain victims have different views on the |
| 2 | appropriate treatment of the defendant is important to weigh, |
| 3 | I'm sure. |
| 4 | THE COURT:  It is. |
| 5 | MR. NESSIM:  But it doesn't negate what happened here |
| 6 | and it doesn't negate the repeated nature of this, the years of |
| 7 | the conduct.  And I think the guidelines, as the Court noted, |
| 8 | they don't capture the central focus of this conduct. |
| 9 | THE COURT:  The guidelines are a big problem here, and |
| 10 | I considered them and I'm going to ignore them, and I'm going |
| 11 | to tell you that right now because the guidelines capture -- |
| 12 | you've worked into the guidelines exactly the wrong thing, |
| 13 | which is publishing houses have funny things happen to them all |
| 14 | the time and they have legal costs associated with that.  It's |
| 15 | a cost of doing business.  I am not impressed with that as a |
| 16 | six-point enhancement.  On the other hand, there isn't anything |
| 17 | in the guidelines that captures the real harm that was done to |
| 18 | victim No. 1.  So the guidelines are kind of useless to me |
| 19 | here.  And I will just tell you that I have considered them as |
| 20 | I am required to under Section 3553(a), and I think they are |
| 21 | useless, completely, totally, utterly useless.  That is my |
| 22 | considered opinion. |
| 23 | MR. NESSIM:  Understood, your Honor.  And the |
| 24 | guidelines also don't consider that this went on for five |
| 25 | years.  They don't consider the hundreds -- |

N3NCberS

1          THE COURT:  I told you I think they're useless.  So

2     don't argue guidelines to me.

3          MR. NESSIM:  Right.  I'm just saying the conduct here,

4     the years of it, the sophistication of it, the harm to the

5     victims, sort of the propitious daily activity of the defendant

6     in impersonating people, stealing their identities and

7     obtaining these valuable manuscripts.  Obviously there was a

8     range of impact on the number of victims that were impacted

9     here, was incredibly serious, incredibly -- this is not the

10    crime of the century, your Honor, but --

11         THE COURT:  No, it's not crime of the century.

12         MR. NESSIM:  But it was serious, and we believe that

13    an incarceratory sentence is appropriate to recognize that

14    seriousness.

15         And I'll just end with deterrence.  This is a case, as

16    the Court has mentioned, that has gotten a good amount of

17    attention.  This is a case that will be able to send a message

18    to others that this kind of predatory behavior behind the

19    safety of a keyboard at a distance is still a serious crime,

20    it's still an offense that can send someone to jail and it's

21    still conduct that no one should engage in.

22         THE COURT:  Okay.

23         MR. NESSIM:  Unless the Court has any other questions,

24    we'll rest on our submission.

25         THE COURT:  Thank you.

N3NCberS

| | |
|---|---|
| 1 | Ms. Brown, have you reviewed the presentence report? |
| 2 | MS. BROWN:  I have, your Honor. |
| 3 | THE COURT:  Have you gone over it with your client? |
| 4 | MS. BROWN:  Yes, your Honor. |
| 5 | THE COURT:  Any additions, deletions, or corrections? |
| 6 | MS. BROWN:  A very minor typo, your Honor, which I |
| 7 | discussed with the government. |
| 8 | THE COURT:  What page? |
| 9 | MS. BROWN:  Page 12, paragraph 66. |
| 10 | THE COURT:  Yes. |
| 11 | MS. BROWN:  It relates to his immigration status. |
| 12 | It's just a typo, because otherwise it's correct in other |
| 13 | areas.  Defendant was granted, it's called indefinite leave to |
| 14 | remain.  So "limited" should be replaced by "indefinite," which |
| 15 | is essentially the equivalent of permanent lawful residence in |
| 16 | the U.K.  She repeats that error in the justification, that |
| 17 | same typo, but I don't think that matters. |
| 18 | THE COURT:  That's indefinite from the U.K.? |
| 19 | MS. BROWN:  Correct. |
| 20 | THE COURT:  In the end, I'm not terribly concerned |
| 21 | with U.K. immigration issues. |
| 22 | MS. BROWN:  He's concerned. |
| 23 | THE COURT:  He may be, but I'm not.  That's his |
| 24 | problem with the King's government. |
| 25 | MS. BROWN:  The reason I point out the typo, your |

N3NCberS

1    Honor, is because if you do incarcerate him and this document

2    goes to the prison, his immigration status is important because

3    he would have additional time in immigration custody and that

4    is why I made the correction, your Honor.

5            THE COURT:  The United States of America did not grant

6    him indefinite leave to be here, he was granted indefinite

7    leave to be in the United Kingdom.

8            MS. BROWN:  Absolutely, your Honor.  This country has

9    paroled him into the country only for purposes of this case.

10           THE COURT:  For this case.  That's what I understood.

11           So Ms. Brown, I will hear you on sentencing.  I mean,

12   you've persuaded probation, but there's a lot in what

13   Mr. Nessim had to say this morning.

14           MS. BROWN:  I appreciate that, your Honor.

15           Before I begin, I just want to identify who's in the

16   courtroom for Mr. Bernardini.  In the front row is his partner,

17   Van K, who came from the U.K.  Sitting next to him is the one

18   friend who he has in the United States, Kim, whose last name I

19   don't remember.

20           THE COURT:  Ms. Brown, I had a sinus infection

21   recently.  I'm having a hard time hearing you.  If you can

22   either go back to the podium and use that or sit down and use

23   the microphone.  Do something so the microphone is reasonably

24   close to you.

25           MS. BROWN:  I'll try the podium, your Honor.

N3NCberS

1          THE COURT:  I appreciate it.

2          MS. BROWN:  Can you hear me now?

3          THE COURT:  Much better.

4          MS. BROWN:  Your Honor, I've started by saying who's

5     in the courtroom here for Mr. Bernardini.  His partner, Van K,

6     and the one friend he had in the United States, Kim Cleaver.

7          Your Honor, first I want to acknowledge that the

8     government is absolutely correct, this was not a moment's

9     aberration, this was longstanding, and I expect that is the

10     primary reason the government declined our request for deferred

11     prosecution and Mr. Bernardini now stands convicted of a felony

12     offense, which will have consequences for the rest of his life.

13          The reason that we focused on the "why," your Honor,

14     is because the unique confluences of factors that went on here.

15     I think that the probation officer frankly got it exactly

16     right.  Her report is extremely thorough and she considered all

17     of the 3553(a) factors.  So it wasn't just the seriousness of

18     the offense and the need to promote respect for the law and the

19     need to punish and deter, but it was also his personal

20     characteristics and the need to provide correctional and

21     medical treatment in the most efficient manner.

22          So I think what's been ignored in the government's

23     submission, both in writings and today, is the substantial

24     impact of the mental health piece here, your Honor.  So that,

25     really, the repetitive nature of it, the compulsivity of it,

N3NCberS

1    the collecting really comes out of what had been previously

2    undiagnosed, autism, your Honor, and you cannot understand this

3    offense without factoring that in.  And the signs were there

4    from very early on.  His savant nature with languages, his

5    inability to connect socially.

6           So, as Dr. Cohen very eloquently described in her

7    report, and she is really the premiere expert in this field,

8    this compulsive collecting comes out of that developmental

9    disorder, your Honor.  And it began for him when he was a

10   child, over 400 Disney movies.  Some people with autism focus

11   on trains, some people focus on movies.  In his case, he became

12   hyper fixated on manuscripts.  So I don't think you can

13   understand this offense.

14          And I hope that the government and the Court does not

15   take away that we are trying to excuse or justify the offense,

16   absolutely not.  There is no excuse, there is no justification.

17   He has accepted responsibility, he has pled guilty, he is

18   prepared to accept whatever punishment.

19          But it does explain and it does mitigate, your Honor,

20   because of the developmental disorder, which he is not in

21   control of and was previously unaware of, he was less able to

22   understand the theory of the mind, the effect of his actions,

23   and he became hyper fixated in a way that other people wouldn't

24   have.  So there's that piece, your Honor.

25          When the government, in its submission, said this is

N3NCberS

1  not a victimless crime, never have we said that this is a

2  victimless crime.  Mr. Bernardini was deeply affected by the

3  victim impact statements.  What he said in his letter, which

4  was true, is that he was not thinking about it from their point

5  of view, right, he was selfishly thinking about it from his

6  point of view, but the ability to not be able to take the

7  perspective of someone else is also a core deficit of autism.

8  But luckily he can --

9          THE COURT:  It's a deficit of most criminal behavior,

10  Ms. Brown.

11          MS. BROWN:  It's different, the collecting act, the --

12  yes, obviously greedy, selfish people steal things and they buy

13  luxury goods — that's not what happened here.  What's so

14  confounding is the accumulation of things and doing nothing

15  with them, and I do think that makes a difference that he --

16  the real concern --

17          THE COURT:  I get that.  I recognize that the first

18  time we met, I said why, and I'm not surprised at the answer

19  that you proposed, it's the answer I would have intuited.  But

20  that explains the compulsion to collect, even the compulsion to

21  want to belong or feel like an insider.  There is no compulsion

22  to threaten people.  There's no compulsion to engage in a

23  spearfishing scheme.  Those are different things altogether.

24          MS. BROWN:  So with respect to the spearfishing

25  scheme, your Honor, as I understand it, it was not malware that

N3NCberS

1    was installed, it was a website that was set up.  They're both

2    wrong, but to the extent that malware has a Russian conspiracy

3    connotation, that's not what was going on here.  He did wrong,

4    he's accepted responsibility for that, but the scheme --

5            THE COURT:  But that's not collecting, that's not

6    prototypical autistic behavior.

7            MS. BROWN:  No, let me finish the thought.

8            So the website was set up to get the information so

9    that he could use -- what he got from that fishing scheme was a

10   scouting report, which is a news letter.  That's literally all

11   he got from that, a news letter that discussed the comings and

12   goings of the publishing industry, what books were up for

13   auction, who was publishing what, when they were publishing it.

14   So it was absolutely fully in connection with the collecting.

15   They went together.  There was no other information that he

16   obtained from that fishing scheme.  It was short in duration,

17   and he used it -- again, he used it for criminal activity,

18   which was to obtain more manuscripts, which he did not share,

19   but it's absolutely -- it is in keeping with the collecting,

20   which is the core feature of the autism, your Honor.

21           With respect to specific and general deterrence, your

22   Honor, and punishment, Mr. Bernardini has been 14 months under

23   very strict pretrial supervision.  He has a bracelet on him

24   still, 14 months.  Pretrial knows where he goes at all times

25   and all eyes of the publishing industry have been on him.  It

N3NCberS

1    is clear that he is able to comport with the rules under these

2    circumstances.  And so, I think -- and he's effectively barred

3    from the publishing industry and he is now aware of his

4    diagnosis and can take steps to accommodate it or learn about

5    it and do better.  So I think what we've seen in the last

6    14 months is that he is specifically deterred and the Court has

7    no reason to have concern that anything like this will ever

8    happen again.

9         With respect to general deterrence, he has been

10   severely punished already, and the sentence that we're asking

11   for will effectuate the message that crime does not pay, even

12   if you don't benefit financially.  So here's someone who did

13   not benefit in any way financially and will be required to make

14   restitution.  I know the Court was not impressed by the $88,000

15   figure, but Mr. Bernardini is feeling the impact of that.  That

16   is approximately four times his annual salary when he was

17   working.

18        THE COURT:  Well, it wasn't that I wasn't impressed

19   with the amount.  I'm not impressed that the guidelines were

20   enhanced using legal expenses that were being incurred by any

21   publisher.  I think that the guidelines were incorrectly

22   enhanced by using those legal fees.  They were done to

23   manufacture a higher guideline and to give this man something

24   to make restitution for, I get that.

25        MS. BROWN:  What I'm saying, it's not a fine, it is

restitution, but having the effect of a very severe fine for a

person of his means, and that is in combination with the

14 months that because he was paroled into the country, he

could not work.  He volunteered his time, but he could not

work.  He was not lawfully able to work in this country.  So he

started from scratch.  His savings are entirely depleted, your

Honor.  He has $3,000 available for restitution that he's

prepared to pay immediately.  That is the full sum of his

remaining savings.  He's now 30 years old, your Honor, this

offense started when he was 25, and he's beginning entirely

anew in a new field with no money with a felony conviction with

his life.

          I mean, ironically, right, he invaded the privacy of

others by taking their passwords, he deceived people, and

people turned over private material to him that he was not

entitled to — all of this has happened to him in spades.

Everything about his childhood, people have come to where he

lives, they've reached out to his friends and his family.  His

life has been, because of the media attention, made available

not just in the United States, it was an international story.

And maybe it was because it was COVID and people had too much

time on their hand —-

          THE COURT:  No.  It was an interesting story.

          MS. BROWN:  Whatever the reason, your Honor, that has

had an impact on him and his loved ones that is unique.  And I

N3NCberS

don't think the media means to be punishing, but it is.  And he
brought this on himself by doing this and doing it for so long,
but it is a feature of punishment.

          So how has he been punished?  Unable to work for
14 months, has to now pay back four times what he used to be
able to earn in a field that he can no longer be in, in a field
that was in his disorder, your Honor, the core thing that he
loved, right, books and manuscripts and writers and publishing
is the core thing that he loved and that is gone to him.  So
he's going to start anew in, perhaps, the food service
industry.  It might take him a decade to pay back that $88,000
depending on how quickly he can earn it.  For the next decade,
your Honor, every time he sends a check to the clerk of the
court, he's going to be reminded of what he did to himself.  So
I don't think that anybody would look at this and say, I'm
going to get no financial gain, I'm going to end up financially
destitute.

          He's been, unlike someone who was a United States
citizen, he has been separated and isolated from his home and
everyone who he loved for the last 14 months, and because he
wasn't able to work, he's been able to do nothing but think
about, separate and apart from the volunteer work, your Honor,
but think about what he did wrong and how he can make amends.

          So part of the way he's going to make amends is making
the restitution.  It is something to get a diagnosis of a

N3NCberS

developmental disorder late in life, that is unusual, even

though all the signs were there.  And so, it's something that

he's been grappling with.  Some people might take that

diagnosis and feel stigmatized, he has become very curious.  So

he's learning everything he can about that.

He has voluntarily, your Honor, there was court

imposed mental health treatment from pretrial, which he

absolutely cooperated.  He cooperated to the letter of

everything, your Honor, including that period of time when he

had to say where he was if he was gone longer than an hour, he

has never not complied.

So he was separated from everyone that he loves.  The

family that he has is essentially his chosen family in England,

and that includes his dog, which, to him, is like his child,

that's the closest thing he has.  And the letters talked about

the impact, that he is essentially a shell of the person he

was.  And the anxiety is real.  Dr. Cohen talked about that,

how he really -- but what has he done with that?  He's taken

steps to overcome and to be resilient.

So what has he done in addition to the court ordered

mental health treatment?  He has sought out voluntary extra

mental health treatment, he's reading up on autism, and he's

thinking of ways he can give back once he returns to the United

Kingdom.  So he's thinking of teaching Chinese immigrants to

learn English.  He's trying to think of ways to make amends,

N3NCberS

1    your Honor.  He was heartbroken to read the victim impact

2    statements.  He felt those deeply.  And in the way of someone

3    who is absolutely passionate about books, and that is the core

4    obsession of his life, he was heartbroken to think of the

5    author who said the anxiety made her unable to write for a

6    time, that that might prevent the world from knowing the next

7    book because the book itself is so meaningful to him because

8    that's what his obsession is.  That's separate and apart from

9    the empathy of someone who's struggling with severe anxiety for

10   the last 14 months and before he could empathize with someone

11   else who is suffering that anxiety.

12           So he has been punished.  And no one that is looking

13   at this shell of a man, who is stigmatized with a felony

14   conviction, could say — and separated and isolated — has not

15   been punished.  So the message will get out, your Honor.  If

16   you impose restitution and sentence him to the period of

17   time -- he's already served 14 months away from his home and

18   his loved ones, and, your Honor, if you sign the judicial order

19   of removal -- You said you have not seen one before.  Let me

20   just explain the process that we went through to get that.

21           So, because he has no status in this country, he is

22   going to be deported at the completion of his sentence, but if

23   you sign that judicial order of removal, he doesn't need to go

24   through an immigration hearing.  If the Court imposes a period

25   of incarceration, because he has the judicial order of removal,

N3NCberS

1    he likely will not be sent to a camp because of the immigration

2    detention.  And I received an email this morning from ICE

3    indicating that if he receives a sentence other than time

4    served, even with the order of removal, he will be detained in

5    immigration custody for some period of time, even though he's

6    given up his right to a hearing.  And, your Honor, the felony

7    means that he's never coming back here, he's barred from this

8    country, he's inadmissible.  So the immigration consequences

9    are collateral consequences.  If, on the other hand, you do not

10   impose a jail sentence, then immigration, because of his good

11   behavior on pretrial release, will allow him to pay his own way

12   and arrange for his own transportation, and they would allow

13   that as long as he provides his itinerary to ICE, they will

14   allow him to do that as soon as this weekend or Monday, he

15   could return to the United Kingdom where he's permitted to

16   stay.

17           And finally, your Honor, you said that the victims'

18   views are relevant to you, but they don't dictate.  You

19   obviously have a difficult job of weighing these matters.  And

20   I will say that even the scout who obviously suffered harm in

21   this case did not ask for Mr. Bernardini to go to jail.  And

22   there have been many people who have been very vocal about

23   their desire to have him not go to jail, even people like the

24   last victim impact who was deeply hurt by it do not want to see

25   him punished.  Many prominent authors who have a voice and

N3NCberS

1   understand that there are real victims here and that the harm

2   was ongoing don't think that incarceration, especially for

3   someone who has his vulnerabilities, the autism, his sexual

4   orientation, and his not being a United States citizen, his

5   inability to read the social cues, his short stature would make

6   him very, very vulnerable to be in prison.  So that kind of

7   punishment, your Honor, for even a short period of time, would

8   be greater than necessary.

9           And so, that's why I encourage you to follow the very

10  well reasoned recommendation of the probation department in

11  this case.  She had all the victim impact letters, your Honor,

12  she took everything into consideration, not just the severity

13  of the crime, that's one factor, but it's not the only factor.

14  And I do think it does matter that he didn't profit in any way

15  and that none of the manuscripts were monetized, and that none

16  of the authors' work was published before the due date and the

17  authors did not suffer reputational or financial harm.

18          So, if you have further questions, I'd love to know

19  what you're thinking so I could address it.

20          THE COURT:  Thank you, Ms. Brown.

21          Mr. Nessim, anything else from the government?

22          MR. NESSIM:  Not unless the Court has specific

23  questions, your Honor.

24          THE COURT:  It's hard to know what to ask.

25          MR. NESSIM:  I will just say that, just briefly as to

N3NCberS

1    the question of the impact of his diagnosis on the crime here,

2    the Court's read, obviously, all the submissions and emails

3    here.  It's hard to argue that only at the time of his arrest

4    did he become aware of the potential impact on his victims, the

5    potential stakes of his action.  Even if he was incapable of

6    reading social cues to the extent of the average person, he's

7    being directly told over the course of years this is a crime,

8    you're hurting me, don't do this — he ignored it.  And he's

9    also someone who has been diagnosed with this condition late in

10   life and is in a committed long-term relationship, has held

11   regular jobs.  He is not someone whose life is -- he's not

12   incapable of functioning with others.

13            MS. BROWN:  Can I respond to that?

14            THE COURT:  Sure.

15            MS. BROWN:  I will say that his life has been impacted

16   by that diagnosis.  I think what the expert was talking about

17   is the difficulties that he had during his internship, his

18   inability to get hired for two years, was very likely related

19   to his inability to relate appropriately to people in the

20   workplace.  We saw that again, your Honor, even with his

21   voluntary work, if you read that paragraph in the presentence

22   report.  Oh, no.  I'm sorry.  That was wrong.  That was in

23   Dr. Cohen's report.  That even in the getting back, his social

24   deficits affected his ability to do volunteer work.  He

25   persevered, your Honor, and he found other employment.  So I

N3NCberS

1  think it's incorrect to say his diagnosis has affected his

2  ability.

3        And you see that the vast majority of the friends and

4  letters of support are his partner, his family and friends.

5  Really, all he has is his one friend from school and his

6  partner and his dog.  That's what he has.  That's a fine way to

7  be in the world, your Honor, with one close friend, your

8  partner, and your dog, but I don't think it's fair to say he

9  hasn't been impacted by his autism.

10        THE COURT:  I don't think that's what the government

11  is saying.  I think that the government is saying that while

12  his condition undoubtedly played a role in this — I personally

13  have no doubt about that — that he is functioning at a high

14  enough level that he has been able to maintain a relationship

15  and that he is likely not entirely impervious to the messages,

16  the import of the messages that were being sent to him by

17  people saying stop, you're hurting me.  I think that's what the

18  government is saying.  And I happen to be very sensitive to

19  suggestions that people who are on the spectrum have no

20  feelings, no perceptions, and no ability to discern.

21        MS. BROWN:  That is not what I'm saying, your Honor.

22  He knew it was wrong, he absolutely knew it was wrong.  That's

23  why he pleaded guilty and accepted responsibility.  What I

24  think the expert was saying, and I think it is present, is that

25  he is compromised in his ability to take the perspective of

N3NCberS

1    another person.  He's devastated by the harm that he caused,

2    your Honor.  He understands the harm.  And just the repetition,

3    despite being told "stop," that is where the autism comes in

4    because it did become compulsive and this need to collect was

5    more powerful than his good sense.  So it's not that he -- he

6    absolutely knew what he was doing was wrong.  He struggles with

7    this perspective taking, and it was more difficult for him to

8    stop, even knowing that it was wrong.

9          But again, just to get back to where we were, he did

10   not do anything with -- he caused harm, but a different kind of

11   harm, your Honor, and he's been punished and will continue to

12   be punished.

13         THE COURT:  Mr. Bernardini, is there anything that you

14   want to say to me before I sentence you?

15         THE DEFENDANT:  Good afternoon, your Honor.  Thank

16   you, your Honor.

17         What I would like to express is how shamed,

18   embarrassed, and remorseful I am for the crime that I have

19   committed.  I am mortified about the harm and damage that I

20   have inflicted upon so many people.  Reading the victim impact

21   statements was extremely painful for me as it crystalized the

22   detriment that I have caused.  Over the last 14 months, I have

23   spent a lot of time reflecting on my actions and I want to

24   offer my heartfelt apologies to the victims for the pain they

25   endured.

N3NCberS

1        Thank you.

2        THE COURT:  I'm not going to kid anybody, I have no

3   idea what to do with this case.  And I thought about it a lot.

4   In my own acquaintance with people who are on the spectrum who

5   have never committed a crime in their lives, even though they

6   lack certain empathic skills, makes me just kind of cringe at

7   the thought that, somehow, Mr. Bernardini's undoubted diagnosis

8   can excuse antisocial behavior, weird antisocial behavior, very

9   weird antisocial behavior.  In fact, as I was reading through

10  the pile of emails that the government sent, I actually started

11  to wonder if he wasn't like the guy in the movie "Catch Me If

12  You Can," that he wasn't actually getting off on the fact that

13  he was fooling all these people and able to keep this going for

14  as long as he was able to keep it going.  And yes, at one

15  level, it's a prank.  Pranks can hurt people.  At one level,

16  it's a prank.  It's a prank that's now been inflated into a

17  crime and that's going to follow Mr. Bernardini around for the

18  rest of his life.  I have gone back and forth, and back and

19  forth, and back and forth on what to do in this case.

20       Ironically, the PSR was filed so late that, as I think

21  everybody -- well, as you guys know, I do sentencing folders on

22  the weekend, so this wasn't in the sentencing folder when I

23  read the sentencing folder, there was no PSR.  Jim had a note,

24  "waiting for the PSR."  I didn't see the PSR until this

25  morning.

N3NCberS

1          And I agree with Ms. Brown, it is an unusually

2     thorough -- and no offense to probation, I'm not suggesting

3     that I don't usually get thorough, thoughtful presentence

4     reports, but it is a particularly thorough and thoughtful

5     presentence report by an experienced officer who weighs and

6     balances factors and makes a recommendation that, in the end,

7     makes as much sense to me as anything else does in this case

8     because nothing makes sense in this case.

9          Sending Mr. Bernardini to jail is not going to make

10    any of the victims feel better.  It's not going to make any of

11    the victims feel more secure because, frankly, as a person who

12    lives in constant terror of clicking on a fish, Mr. Bernardini,

13    the notion that my personal information could somehow be stolen

14    by anybody for any reason, even if he didn't intend to use it,

15    is terrifying.  And I'm sure all these people were at some

16    level terrified that some unknown person had information about

17    them that, who knows how it could have been used.  Sending you

18    to jail isn't going to undo that.  Sending you to jail

19    literally, the only thing I think it might accomplish, given

20    the notoriety of the case, is there's some geek out there who

21    wouldn't think that it was a cool idea to do something like

22    what you did.  But I really doubt that.  I really doubt that.

23         In all the circumstances, this is a case in which I'm

24    going to be guided, I choose to be guided by the wisdom of my

25    experienced probation officer.  I don't think I have any more

N3NCberS

wisdom to lend to this situation than she does.  We've read the same things, we both have a lot of experience with fraud crimes, and she makes a persuasive case for a sentence of time served.

As I said, the guideline itself is suspect because it only gets to be 15 to 21 months because of the $88,000 in legal fees that Mr. Bernardini is going to have to pay to Penguin Random House, otherwise the guideline, given that we have immeasurable harms here that aren't incorporated into the guideline, is a total offense level of 8 and a guideline sentence of zero to six, that's no months to six months. Frankly, the fact that Mr. Bernardini is going to have to come up with $88,000 over the course of the next years of his life, in my mind, adequately accounts for the $88,000 and the six points is an unnecessary piling on.  So, to me, if there's a guideline at all in this case, it is more logically a total offense level of 8 and criminal history category of I.  I accept that you stipulated that the guidelines should be total offense level of 14, but when I think about them, I just can't factor that $88,000 in it, it doesn't make sense to me to factor that in in order to get to an incarceratory sentence of more than a year.

Having reviewed the presentence report, I accept and adopt its findings.  I accept and adopt its description of the offense and the offense conduct.  I accept the guideline

N3NCberS

| 1 | calculation is technically correct because the parties have
| 2 | stipulated to an $88,000 loss which, given the way the fraud
| 3 | guideline works, adds six levels to the base offense, which is
| 4 | an awful lot when your base offense level is very low to begin
| 5 | with.  The defendant has no criminal history category.  His
| 6 | criminal history category is obviously I.  I accept and adopt
| 7 | as my findings the offender characteristics, which is set forth
| 8 | beginning at paragraph 52 of the presentence report.  I've done
| 9 | what the probation officer carefully set out that she did,
| 10 | which is to consider all the Section 3553(a) factors.

| 11 |          I wish there were some way to make that poor person
| 12 | who was suspected of being you whole.  I wish there were some
| 13 | way that I, as a judge, could give him something to make up for
| 14 | what he lost professionally.  He's the person who has kept me
| 15 | up when I thought about this case, he's the person I kept
| 16 | coming back to, but I can't.  I can't think of anything, I
| 17 | can't think of any way to make him whole.  I hope his name is
| 18 | known in the industry.  I know now that people know he wasn't
| 19 | the guy and I hope his career has recovered.

| 20 |          By the way, let this be a lesson to folks, people can
| 21 | be wrongfully accused and wrongfully suspected, and there are
| 22 | very real consequences to that.

| 23 |          Would you please stand.

| 24 |          Under docket No. 21 Cr. 458-001, Mr. Bernardini, I
| 25 | hereby sentence you, as recommended by the probation

N3NCberS

1    department, to a term of time served to be followed by a term

2    of three years of supervised release, although I'm not exactly

3    sure how that's supposed to play out since he's going to be

4    removed, like he's leaving the country immediately.

5              MS. BROWN:  Your Honor, perhaps you can make explicit

6    in the terms of supervised release that he is permitted to

7    leave the country so that that doesn't prevent his departure.

8              THE COURT:  But the point being that ain't nothin'

9    going to happen to him.  Well, he may have some immigration

10   consequences, nothing I can say about that, but we're not going

11   to be supervising him once he leaves the country.

12             MS. BROWN:  The probation officer indicates in her

13   recommendation that it would be unmonitored supervision.

14             THE COURT:  You are required to make restitution to

15   pay the Random House in the amount of $88,000.  I have a

16   consent order of restitution, which I'm signing here on this

17   23rd day of March 2023.  And you do that by making checks,

18   money orders, or online, payable to the Clerk of the Court of

19   the Southern District of New York, mail to be delivered to this

20   courthouse at 500 Pearl Street, attention cashier.  There is a

21   website, and it's in the judgment of which you'll have a copy,

22   about how such payments can be made online.  You do need to

23   write your name and the docket number of the case on any

24   payment.  You need to notify within 30 days the clerk of the

25   court, the probation office during the next three years, and

N3NCberS

1   the United States Attorney's Office, attention financial

2   litigation program, any change in your name, residence, or

3   mailing address, or material change in your financial situation

4   that might affect your ability to pay restitution.  And this

5   is, as it says in this judgment, an obligation that will follow

6   you around for 20 years.  That is how long judgments last in

7   the United States, civil money judgments.  So I appreciate that

8   Ms. Brown has indicated that you wish to pay a chunk of that

9   restitution using what remains of your savings now and that's

10  good because interest is going to accrue on it.

11          MS. BROWN:  Your Honor, I have consulted with the

12  government and they don't oppose the Court, under 18 U.S.C.

13  3612(f)(3)(A) waiving the interest, if the Court would consider

14  if the government does not oppose.

15          THE COURT:  Mr. Nessim.

16          MR. NESSIM:  That's correct, your Honor, we don't

17  oppose the waiving interest.

18          THE COURT:  In that case, I'll waive interest.

19          In any event, obviously the sooner you pay it, the

20  better because it's going to hang over your head, but I

21  appreciate that it's going to be difficult for you to find work

22  and to find, in particular remunerative work.

23          So, it is a condition of your supervision that you

24  leave the United States and that you do so as quickly as

25  possible.

N3NCberS

1      I have a notice of intent to request judicial removal

2   here and a proposed order of judicial removal, which I am

3   signing on this 23rd day of March at 1:10 p.m., indicating that

4   you've waived your right to notice of a hearing.  You must

5   pursue including any and all form of relief and protection from

6   removal, and that will be docketed.  And it's my intention and

7   the intention of the probation department that while you shall

8   spend the next three years on supervised release, it will be an

9   unmonitored release because you will not be in the United

10  States.

11      Now, you are a convicted felon.  Were you to reenter

12  the United States without the permission of the Attorney

13  General of the United States, you would be guilty of another

14  crime, the crime of felony reentry, a felon reentering the

15  United States without the permission of the Attorney General,

16  which I don't think the Attorney General is likely to give you.

17  And the punishment for that crime is a rather long term in

18  jail.  And I doubt very much that you would be able to dodge

19  incarceration a second time around if you were to reenter the

20  country.  So I'm assuming that when you get on that airplane,

21  that's the last that we will see of you in the United States.

22      You're required to pay a special assessment to the

23  clerk of the court of $100.  That amount is due and payable

24  immediately.

25      Do we have an appeal waiver in this case?

N3NCberS

1              MR. NESSIM:  Yes, your Honor.

2              THE COURT:  At 21 months?

3              MR. NESSIM:  Yes.

4              THE COURT:  Do you recall, Mr. Bernardini, that at the

5     time you took your plea, you also signed a letter that had been

6     prepared by the government?

7              THE DEFENDANT:  Yes, your Honor, I do.

8              THE COURT:  And in that letter, it said that if I

9     sentenced you to 21 months or less, you would not take an

10    appeal from your sentence and you would not bring a lawsuit

11    challenging the legality of your sentence.

12             Do you recall that?

13             THE DEFENDANT:  Yes, your Honor, I do.

14             THE COURT:  Did you have an opportunity to talk to

15    Ms. Brown about what that meant before you signed the letter?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  And did you understand that by signing

18    that letter, you were giving up your right to take an appeal

19    from your sentence in certain circumstances?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  I've sentenced you to time served, which

22    is less than 21 months.  So it's my understanding that you've

23    waived your right to take an appeal from your sentence.

24             Is that also your understanding?

25             THE DEFENDANT:  Yes, your Honor.

N3NCberS

1          THE COURT:  Did you sign that letter of your own free

2     will?

3          THE DEFENDANT:  Yes, your Honor.

4          THE COURT:  Given it's not going to be a supervised

5     term of supervised release, I see no need to read into the

6     record *ad nauseam* all of the conditions that the defendant is

7     not going to be required to comply with.

8          MS. BROWN:  Agreed, your Honor.  Plus, we have it in

9     the presentence report.

10         One thing, your Honor, in order for the Pretrial

11    Services department to return Mr. Bernardini's passport, they

12    require an order of the court.  So we are asking that the Court

13    order pretrial to return his passport to him.

14         THE COURT:  Well, pretrial will return the passport

15    and I assume pretrial will remove the bracelet.

16         MS. BROWN:  They will remove the bracelet without the

17    order, but they won't return the passport without a specific

18    order.

19         THE COURT:  You wouldn't have happened to have drafted

20    something, would you have, Ms. Brown?

21         MS. BROWN:  No, but it's a one-line order and I will

22    send it over immediately.

23         THE COURT:  Thank you.  Please be seated.

24         I don't expect to see anything like this ever again.

25         Mr. Nessim, is there anything else that I have to do

N3NCberS

1    from the perspective of the government?

2            MR. NESSIM:  Yes, your Honor.  I'd like to move to

3    dismiss the underlying indictment.

4            THE COURT:  Underlying indictment is dismissed.

5            Ms. Brown.

6            MS. BROWN:  Nothing else, your Honor.

7            THE COURT:  These proceedings are closed.

8                             *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25